**STINSON v. NEW YORK LIFE INS. CO.**
No. 9568.

United States Court of Appeals
District of Columbia.

Argued Jan. 22, 1948.

Decided March 15, 1948.

Mr. Harry A. Finney, of Washington, D. C., with whom Messrs. John R. Fitzpatrick and Edward J. Lynch, both of Washington, D. C., were on the brief, for appellant.

Mr. G. Bowdoin Craighill, of Washington, D. C., with whom Messrs. John S. Flannery and A. Murray Preston, both of Washington, D. C., were on the brief, for appellee. Messrs. Caesar L. Aiello and John E. Larson, both of Washington, D. C., entered appearances for appellee.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Associate Justices.

CLARK, Associate Justice.

Appellant is the beneficiary designated in a policy of life insurance which was issued by appellee on November 24, 1942, to the now deceased husband of appellant. At the time the policy was issued the decedent was serving as a Major in the Quartermaster Corps, United States Army, and was stationed at Camp Lee, Virginia. Appellant averred in her complaint that under the terms of the policy the insurer, appellee here, agreed to pay, upon receipt of due proof of the death of the insured, to appellant, or in the event of her prior death, to the insured's mother, the sum of ten thousand dollars. The complaint recites that the insured, Jack L. Stinson, met his death October 2, 1945, by accidentally falling from a window of the Hotel du Nord in Reims, France. It is further averred that appellant properly presented proof of death of the insured and applied for payment in accordance with the terms of the policy, which was refused.

Appellee answered and raised as a complete defense to all except a restricted recovery (which involved a return of the premiums paid, with interest) a rider captioned "Additional conditions relating to War and Aviation," which was attached to and made a part of the policy. The pertinent provisions of this rider relied upon by appellee are as follows:

"The only amount payable under this policy shall be the restricted amount hereinafter defined if the death of the Insured shall occur in the circumstances set forth in any one or more of the following clauses (1), (2), (3) or (4), namely

"(1) outside the Home Areas while the Insured is in the military or naval forces of any country engaged in war;

\*   \*   \*   \*   \*   \*

"Said restricted amount shall be a sum equal to the premiums which shall have fallen due hereunder prior to the date of death of the Insured and been paid to and received by the Company, together with compound interest at the rate of three per cent per annum, plus the reserve on any outstanding dividend additions, and any outstanding dividends, including dividend deposits, and less any indebtedness hereon. \* \* \*

"Wherever used in this Policy,

" 'Home Areas' means the forty-eight states of the United States of America, the District of Columbia, the Dominion of Canada and Newfoundland;

" 'War' includes undeclared war;

" 'Military or naval service' includes service in the air forces of a country, including air training forces and forces charged with the operation or maintenance of any kind of aircraft, and 'military or naval forces' include any such air forces; \*·\* \* ."

The appellee admitted liability for a "restricted amount" of $880.59, and made tender of that sum, which was refused.

Appellant filed interrogatories, pursuant to Rule 33, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to determine whether the appellee had continued to write into its new policies of insurance, after the surrender by Japan, the same conditions relating to war and aviation, and also to learn, provided that practice had been discontinued, the date of discontinuance. Appellee objected to the interrogatories and the trial court sustained the objection; appellant contends this was error.

Appellee then filed a motion for summary judgment, contending that there was no genuine issue as to any material fact and that as a matter of law appellee was entitled to judgment. Agreeing that no material fact was in dispute, appellant filed objections to appellee's motion together with

her own motion for a summary judgment. By agreement the two motions were heard jointly, and the trial court then granted appellee's motion, but awarded appellant $880.59. Judgment was entered in accordance therewith, and from that judgment this appeal was taken.

We face the necessity of interpreting a contract. Our sole duty is to find out what was intended by the parties according to the expressed or apparent intent manifested by the language employed, and give effect to that intention if it can be done consistently with legal principles. In attempting to judicially determine the probable intent of the parties, consideration is directed to the purpose of the contract and the circumstances surrounding its execution. Subjective analysis of the terms of the contract is of little benefit, for words studied out of context are usually variable in meaning. Objective analysis may not produce an indisputable result, but it is the method we must adopt as the one calculated to produce a greater degree of fairness in the result.

Generally speaking, contracts should not be so narrowly or technically construed as to relieve the obligor from a liability fairly within the scope or spirit of their terms, nor should they be so loosely construed as to frustrate their obvious design.[1] A court has no basis for relieving one party from contract provisions to which he has agreed, merely because they operate disadvantageously as to him. With particular regard to the type of contract before us, it is a well-known rule of insurance law that where an insurance contract is ambiguous and fairly susceptible of two or more interpretations, the interpretation most favorable to the insured will be adopted.[2] And unless it is obvious that the terms were intended to be used in their technical connotation, they will be given the meaning that common speech imports.[3] We must attempt to ascertain and effectuate the lawful intention of the parties, and, in the light of these precepts, we proceed to a determination.

It is conceded by appellant that the insured died outside the "Home Areas" while serving in the military forces of the United States. Clause (1) of the rider contained additional modifying words conditioning the exemption of liability, however, and it is the phrase, "of any country engaged in war," which requires interpretation. We must determine, therefore, whether the United States was a "country engaged in war" when the insured met his death on October 2, 1945. No identical provision has previously received judicial consideration by an appellate court,[4] although the last two wars involving the United States have produced an abundance of litigation centering on similar war risk exclusion clauses. The decisions are not particularly helpful for the reason that they construe clauses making "status" of the insured, or "cause of death" of the insured, the deter-

---

[1] Davison Chemical Co. v. Baugh Chemical Co., 1918, 133 Md. 203, 104 A. 404, 3 A.L.R. 1.

[2] Aschenbrenner v. United States Fidelity & Guaranty Co., 1934, 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; Stipcich v. Metropolitan Life Ins. Co., 1928, 277 U. S. 311, 48 S.Ct. 512, 72 L.Ed. 895; Mutual Life Ins. Co. of New York v. Hurni Packing Co., 1923, 263 U.S. 167, 44 S. Ct. 90, 68 L.Ed. 235, 31 A.L.R. 102.

[3] Aschenbrenner v. United States Fidelity & Guaranty Co., supra, note 2; Neighbors v. Life & Casualty Ins. Co., 1930, 182 Ark. 356, 31 S.W.2d 418; Tupper v. Massachusetts Bonding & Ins. Co., 1923, 156 Minn. 65, 194 N.W. 99.

[4] When the trial court filed the memorandum opinion in this case February 6, 1947, it was stated therein, "No identical provision appears to have been used in policies of insurance which have been the subject of previous judicial consideration." The trial court was unaware that Durham v. New York Life Ins. Co.,* involved an identical provision; the District Court of the United States for the District of Utah gave judgment for plaintiff for the full policy value January 3, 1947. An appeal was taken to the United States Circuit Court of Appeals, Tenth Circuit, wherein oral argument was heard January 7, 1948. Also, Ziegler v. New York Life Ins. Co.*, tried before the Circuit Court of Cook County, Illinois, involved an identical provision. The court granted plaintiff's motion for summary judgment for the full policy value September 19, 1947. The case has been appealed to the Illinois Appellate Court.

* No opinion for publication.

mining factors. Here we have a "status" clause extended to include also the "war status" of the country. Excellent discussions[5] and annotations[6] reviewing some or many of the prior related adjudications are available, which serve mainly to highlight the problems inherent in judicial consideration of the variously phrased war risk exemption clauses.

In a memorandum opinion the trial court expressed the view that the term "engaged in war" has a meaning so well recognized and of such long historical acceptation that it must be presumed to have been clearly understood by both parties that the United States continues to be engaged in war until the legislative or executive authority, or both, recognize and declare that the nation is no longer so engaged. The appellee's argument to us is principally based on the premise that whether the United States is engaged in war is wholly a political question, the determination of which rests solely with the legislative and executive branches of our Government, and their pronouncements are binding upon the judiciary. Appellee urges strongly that we must adopt the view expressed by the lower court or run counter to well established precedent. That argument requires inspection.

The meaning of the phrase "engaged in war" may very according to the purpose for which it was employed and the manner in which it was stated in relation to that purpose. The clause containing that phrase in the contract before us obviously purported to state a condition of non-liability for insurance coverage otherwise provided. The attempt was to define a period of non-liability, dependent on the military status of the insured and the war status of the

country he served, by the use of relative terms, since it was impossible to forecast with definiteness the duration of that period.

■ It is essential to note that fixation of the dates when (regarding World War II only, for the moment) this country became engaged in war and ceased, or will cease, to be engaged in war, depends entirely on the standpoint from which it is viewed. From the standpoint of public law we accede to the view urged upon us here by appellee, and that adopted by the trial court. In Citizens Protective League v. Clark, 81 U.S.App.D.C. 116, 121, 155 F.2d 290, 295, decided May 2, 1946, this court said: "Appellants say that the war has terminated and that, therefore, the [Enemy Alien] Act, 50 U.S.C.A. § 21 et seq., even if valid, is not in effect. No peace treaty has yet been signed with Germany, and the state of war has not been terminated by act of Congress or by Executive Proclamation. Cases involving the termination of other wars dispose of appellants' point. (Citing cases.[7]) It is not for the courts to determine the end of a war declared by the Congress."

In the Clark case we were treating a matter of public law; here we are concerned with a private contract, and a distinction must be maintained. Professor Manley O. Hudson, in his writing on the duration of the first war between the United States and Germany, made this observation,[8] "As to the termination of a war, one date may be selected for dealing with a question relating to the exercise of special governmental powers, another date may serve in dealing with commercial questions, and a third date may be taken in the construction of a statute or contract provi-

5 Day, The Applicability of War Risk Exclusion Clauses to Death from Ordinary Causes, 19 Rocky Mt.L.Rev. 242 (1947); Price, War and Aviation Clauses in Life Insurance Policies, 14 Ins.Counsel J. 10 (1947); Barton, The War and Aviation Clauses in Life Insurance Policy, 24 Neb.L.Rev. 264 (1945); Note, 15 Geo. Wash.L.Rev. 191 (1947); Note, 56 Yale L.J. 746 (1947); 25 Chi-Kent Rev. 171 (1947); 35 Geo.L.J. 401 (1947); 12 Mo. L.Rev. 212 (1947). See Coit v. Jefferson Standard Life Ins. Co., 1946, 28 Cal.2d 13, 168 P.2d 163, 168 A.L.R. 673.

6 See Notes, 1947, 168 A.L.R. 685; 1942, 137 A.L.R. 1263.

7 Cases cited: The Protector, 1872, 12 Wall. 700, 20 L.Ed. 463; McElrath v. United States, 1880, 102 U.S. 426, 26 L. Ed. 189; Hijo v. United States, 1904, 194 U.S. 315, 24 S.Ct. 727, 48 L.Ed. 994; Kahn v. Anderson, 1921, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469.

8 Hudson, The Duration of the War between the United States and Germany, 39 Harv.L.Rev. 1020, 1021 (1926).

sion. Different dates may also be taken by international courts and municipal courts, for the former may be less influenced by the political action of a single government. If there is no half-way house between war and peace, a given situation may be treated for some purposes as being a state of peace, and for other purposes as being a state of war." And the following passage appears in the decision of the Michigan Supreme Court in Kneeland-Bigelow Co. v. Michigan Central Railroad Co., 1919, 207 Mich. 546, 174 N.W. 605, 608; " 'The existence of a state of war affects different contracts in different ways. Some contracts are avoided or dissolved; others are rendered unenforceable for the time being; others, again, remain unaffected. The particular condition of each contract materially affects the consideration of each case.' Trotter on Con. During and After War (3d Ed.) 7." There the court held a private contract between a shipper and a railroad company would remain unenforceable, by reason of the interposition of federal control over the railroads (effected by authority of the sovereign war power), until such control was removed, or until the legislative or executive departments declared the termination of war, "even though actual warfare has long since ceased." In The Elqui, D.C.E.D.N.Y. 1945, 62 F.Supp. 764, this statement appears (at page 767 of 62 F.Supp.): "Here is not involved a contract between private parties in which it might be said that the term 'for the duration of the present European war' was used in its ordinary or lay concept, referring to the cessation of actual hostilities. The language is employed in an official decree of a government, presumably drawn with all the consideration and formality ordinarily accorded such a document. In the absence of proof to the contrary, this Court must therefore assume that those who drafted this document had in mind the technical meaning of 'for the duration of the present European war'

which must be construed to mean the formal signing of a peace treaty or a proclamation by the sovereign that the war has been officially recognized as being at an end."

Very recently the Supreme Court held[9] that the Housing and Rent Act of 1947[10] is a constitutional exercise of congressional war power. Appellee directs our attention to this statement by Mr. Justice Jackson (concurring): "But I find no reason to conclude that we could find fairly that the present state of war is merely technical. We have armies abroad exercising our war power and have made no peace terms with our allies not to mention our enemies. * * *"[11] In view of the distinction we have noted, that the question of war's duration invokes consideration from a public law standpoint which differs from a private law standpoint, we doubt the applicability of Mr. Justice Jackson's statement to the instant case.

Although appellee contends there is a "legal meaning" in the phrase "engaged in war," and that such meaning is commonly understood, the argument in support of that contention fails to disclose any specific act or pronouncement by one of the political departments which has marked or will mark the time when this country ceases to be engaged in war. By analogy to the several events occurring after the fact of surrender in World War I,[12] which would qualify as political determination of the end of war within appellee's argument, apparently we are left to speculate on what act or pronouncement is sufficient to end this country's engagement in World War II.

The trial court said further, in the memorandum opinion, that "whatever force there is to the contention of plaintiff that the provision under consideration is ambiguous exists, if at all, only as applied to a situation where the death of an insured in the military service of the United States

---

[9] Woods v. Cloyd W. Miller Co., 333 U. S. 138, 68 S.Ct. 421.
[10] Pub.L. 129, 80th Cong., 1st Sess., June 30, 1947, 50 U.S.C.A.Appendix, § 1881 et seq.
[11] 333 U.S. 138, 68 S.Ct. 425.

[12] For a discussion of these events (with citations), see Hudson, The Duration of the War between the United States and Germany, 39 Harv.L.Rev. 1020, 1029–1038 (1926).

and outside the 'home areas' occurred after the declaration that hostilities have ended and before legislative or executive determination that the state of war is over, not to any time prior to the declaration by the President that hostilities have ceased. I cannot, therefore, say that such provision is ambiguous as applied to the instant case."

■■■ We cannot agree with that statement, however. President Truman officially declared the cessation of hostilities in World War II "effective twelve o'clock noon, December 31, 1946,"[13] but that proclamation was for public purposes, and didn't necessarily apply to private contracts. Even if it did, "cessation of hostilities" is not included in the language of this contract, nor can we interpolate such language.[14]

■■ The terms of this contract were devised by appellee to circumscribe its liability, and the contract was presented to the insured in fixed form. The terms used did not result from mutual negotiations and concessions, and it is not unreasonable to apply certain rules we have stated. Appellee presumably had the aid of legal counsel in preparing the contract while the insured presumably had none when he received it. Since the insurer failed to make it obvious at that time that the words used were intended to connote a technical meaning, we must regard them as bearing the meaning common speech imports.

■■ The insured was a layman who had entered active duty in the military service two years prior to the time this contract was executed. To the layman, and to the soldier, the words "engaged in war" convey the thought of actual warfare, terminated by capitulation of the enemy forces. The aftermath of actual warfare necessitates political and legal cognizance of a "state of war," but that is something apart from the common understanding of the time when the country ceases to be "engaged in war." President Truman's message to Congress,[15] delivered September 6, 1945, epitomizes this difference in thinking, for early in his message he said, "The end of the war came more swiftly than most of us anticipated."[16] Later, in the same message, when speaking of certain wartime statutes made effective "in time of war," "during the present war," or "for the duration of the war," he said, "The time has not yet arrived, however, for the proclamation of the cessation of hostilities, much less the termination of the war."[17] And on November 11, 1918, President Wilson, in an address to Congress,[18] read the terms of the armistice and declared: "The war thus comes to an end; for having accepted these terms of armistice, it will be impossible for the German command to renew it."[19]

It can hardly be questioned that the spontaneous celebrations which occurred among the citizenry and troops of the victorious allied forces following announcement of the unconditional surrender by Japan were nothing more than exuberant jubilation occasioned by the commonly expressed thought that the war was over.

Appellee argues that the insured, as a reasonably intelligent man already in military service, can be presumed to have contemplated the necessity for the occupation of enemy lands, after the anticipated defeat of the enemy armies on the field of battle. That is a reasonable presumption, but appellee did not make it explicit, in the contract, that "engaged in war" included such consequential service. And we doubt, seriously, that any soldier considers occupation duty otherwise than as a consequence of war. "Engaged" and "war" have a meaning intimately related to actual warfare in the mind of a soldier, and while he may well contemplate occupation duty following the period of actual warfare, it requires no elaboration to point up his

---

[13] Proclamation 2714, 50 U.S.C.A.Appendix, § 601 note, 12 Fed.Reg. 1 (1947).

[14] Sheets v. Selden, 1868, 7 Wall. 416, 74 U.S. 416, 19 L.Ed. 166; Henrietta Mills Inc., v. Commissioner of Internal Revenue, 4 Cir., 1931, 52 F.2d 931.

[15] 91 Cong.Rec. 8377 (1945).

[16] Id. at 8378.

[17] Id. at 8380.

[18] 56 Cong.Rec. 11537 (1918).

[19] Id. at 11538. " * * * but he [President Wilson] spoke of actual hostilities, as everyone knew, and not of the technical state of the war." H.R.Rep. No. 801, Part 2, 66th Cong., 2d Sess. (1920) p. 2.

distinction of war and the consequential duty it may entail.

Appellee's argument goes much further, however. The insured may have lived to serve among occupying forces and be returned to this country today. If that were the case, and the insured had taken a trip to Bermuda or Mexico, on leave from the service but still occupying military status, and had accidentally fallen from a hotel window in either place, appellee is apparently prepared to argue that the exemption clause in issue here would be applicable to that situation. (It is not argued here that the cause of death is an extraordinary hazard of war or an incident of war, and could not be, since a man could as readily fall, accidentally, from a hotel window in St. Louis or Salt Lake City, or in Bermuda or Mexico, as in Reims, France.) Yet, for the reason that war has not been terminated, in the political sense, appellee would attempt to escape full liability under the exemption clause in this insurance contract. Again we express grave doubt that the insured received understanding that the phrase "engaged in war" would extend so far to exempt full performance of the insurer's obligation.

It is not inappropriate to note that appellee, represented by different counsel, used a far different argument in the case of New York Life Ins. Co. v. Bennion.[20] The company had issued a life insurance policy covering double indemnity for accidental death to Bennion, but excluded from its coverage death resulting from "war or any act incident thereto." The insured was in command of the battleship West Virginia, and was killed at his post of duty during the Japanese attack December 7, 1941, on Pearl Harbor, where his ship was anchored. The joint resolution of Congress declaring war was approved by President Roosevelt, and became effective, on December 8, 1941.[21]

The company denied liability for double indemnity, arguing in part that whether a country was engaged in war was a question of fact, which must be determined not by what Congress had or had not done but by the fact of whether the country was engaged in a "shooting war." The Circuit Court of Appeals, Tenth Circuit, reversing the lower court, held the exemption was applicable, on the ground that war in the grim sense of reality did exist on December 7, 1941, at Pearl Harbor, and that the parties must have intended such effect for the exclusion clause.[22] We think that argument and that holding may as well apply to the question of when this country ceased to be engaged in war. In the "grim sense of reality," and in common understanding, this country was no longer engaged in war on October 2, 1945, a date subsequent to the unconditional surrender of all of the enemy forces opposing this country and its allies in World War II.[23]

In the light of the many adjudications subsequent to World War I, wherein it was held that ambiguous exemption clauses will be resolved in favor of the insured, that "engaged" and "war" are words which have been held to import various meanings, and that interpretation of such words will rest in common understanding in the absence of indicia that technical meaning was attached, it was particularly incumbent upon the insurer to make more obvious the

[20] 10 Cir., 1946, 158 F.2d 260.

[21] 55 Stat. 795 (1941), 50 U.S.C.A.Appendix, Note preceding § 1.

[22] Also, in Stankus v. New York Life Ins. Co., 1942, 312 Mass. 366, 44 N.E. 2d 687, it was held that the death of a seaman on a United States destroyer, sunk by a torpedo in the North Atlantic in October, 1941, was within the meaning of a double indemnity exemption clause identical to that in the Bennion case.

[23] The court takes judicial notice that on the 4th, 7th and 8th days of May, 1945, the German High Command surrendered unconditionally to the Allied Powers all military forces which were then under German control. For texts of the documents of surrender, see 13 Dep't State Bull. 103-07. (July 22, 1945), U.S. Cong.Serv., 79th Cong., 1st Sess. (1945), pp. 1014–1016. And further, that on the 2d day of September, 1945, the Japanese Government proclaimed the unconditional surrender to the Allied Powers of the Japanese Imperial Headquarters, all Japanese armed forces, and all armed forces under Japanese control wherever situated. For text of surrender document, see 13 Dep't State Bull. 362-65 (September 9, 1945), U.S.Cong.Serv., 79th Cong., 1st Sess., (1945) pp. 1017–1018.

240

meaning of the phrase "engaged in war" if it was to extend exemption past the time when enemy forces capitulated and actual warfare ceased. Otherwise the courts must imply that the insurer actually intended only to exclude liability during the continuation of the extraordinary risks incident to actual warfare, which defy actuarial prediction. An attempt, by the use of such a bald phrase, to escape from liability for death resulting from ordinary hazards, at a time when the extraordinary hazards no longer prevail, will seldom meet judicial condonation. We appreciate the fact that insurers face no small problem in framing exclusion clauses, but their draftsmanship does not bear too onerous a burden to make more explicit, to the minds of laymen, the extent of the meaning of such a phrase as "engaged in war." We need not emphasize the ease with which ambiguity inherent in that phrase, in this manner of usage, could have been avoided.

It is interesting to observe that in a paper[24] read before the section of Insurance Law, Illinois State Bar Association, March 20, 1946, an insurance counselor reviewed many war risk exclusion clause cases, and noted that the question presented here was bound to arise. In surmising the result of the adjudication of this question he said[25]: "It cannot be denied that if we apply the test such as used by the Supreme Court in the Aschenbrenner case[26] and assuming that the reference to war was not used in its technical sense but should be given the meaning which common speech imports, then the war must be deemed to have come to an end with the unconditional surrender of our enemies."

The conclusion we reach makes it unnecessary to determine whether the trial court committed error in sustaining the objection to appellant's interrogatories.

The judgment of the District Court is reversed and the case remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

[24] Price, War and Aviation Clauses in Life Insurance Policies, 14 Ins.Counsel J. 10 (1947).

[25] Id. at 17.

[26] Aschenbrenner v. United States Fidelity & Guaranty Co., 1934, 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137. Immediately preceding the statement quoted there appears this pertinent passage from the Aschenbrenner case: "The phraseology of contracts of insurance is that chosen by the insurer and the contract in fixed form is tendered to the prospective policy holder who is often without technical training, and who rarely accepts it with a lawyer at his elbow. So if its language is reasonably open to two constructions, that more favorable to the insured will be adopted, (citing cases); *and unless it is obvious that the words are intended to be used in their technical connotation they will be given the meaning that common speech imports.*" (Emphasis added by Price.)