The **TRAVELERS INDEMNITY COMPANY**, Plaintiff,

v.

James R. **WALBURN**

and

Earl M. **Nalls**, Jr., Individually and as Administrator of the Estate of John Thomas **Nalls**, II, Deceased, Defendants.

Civ. A. No. 74–41.

United States District Court, District of Columbia.

June 27, 1974.

Richard W. Boone, Washington, D. C., for plaintiff.

John G. Gill, Jr., Rockville, Md., for defendant Walburn.

John L. Burke, Jr., Washington, D. C., for defendant estate of John Thomas Nalls, II.

## MEMORANDUM–ORDER

GASCH, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment and defendants' opposition thereto. Plaintiff, The Travelers Indemnity Company (hereinafter referred to as Travelers), seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. that it is not obligated to defend certain claims or indemnify against any liability arising out of those claims pending against Mr. James R. Walburn [Walburn].

## I. FACTUAL BACKGROUND.

The tragic events that gave rise to this litigation occurred in the Fall of 1971. On the night of September 17, 1971, Walburn picked up his shotgun and walked outside his home at 3606 Porter Street, N. W., in the District of Columbia. What followed was the subject of a criminal trial in which Walburn was convicted by jury verdict of second degree murder for the killing of John T. Nalls, II ["Corky" Nalls].

The transcript of that trial,[1] before Judge Aubrey Robinson of this Court, reveals the following facts. Walburn was at home that night when a visitor observed that someone in a white shirt was looking into the yard of the Walburn home.[2] After checking and finding no one, Mr. Walburn went to the garage and picked up his shotgun.[3] Again, finding no one present, Walburn came back into the house but then stepped out onto his front porch with the shotgun loosely held in his hand.[4] At this time Mr. Walburn saw "Corky" Nalls. There was testimony that Nalls and Walburn were not on friendly terms due to alleged sexual improprieties taken by Nalls with Walburn's daughter. What occurred after Mr. Walburn, still holding the shotgun, saw Nalls near his house is described in Walburn's own words as follows:

> Well, as soon as I started to go towards the edge of the porch and stood up I saw this figure out of the corner of my eye, coming up from behind the stucco parapet wall of my neighbor's adjoining house on the east. He was crouched over and came up to my steps where he came into view. He looked up and he hollered "Yeah, it's me, Walburn. I am going to get you. I am going to kill you you god damned son-of-a-bitch," and as soon as I heard this maniac, that tried to kill me before, I thought he is going to kill me. I must get away from him. So there was a brick pillar in front of the porch and I tried to run over and [sic] get behind it and I tried. I `got behind it but then I heard a tremendous explosion and the last thing I knew until I woke up at 6:00 o'clock the next morning was that.[5]

The tremendous explosion described by Mr. Walburn later proved to be the discharge of Walburn's 16-gauge shotgun. The shotgun blast struck "Corky" Nalls in the neck killing him instantly. Notwithstanding the fact that Mr. Walburn testified he had no knowledge of the events immediately subsequent to the shooting, there was uncontradicted testimony from Victor Garcia, a friend of Walburn's son and who was present before and after the shooting, that Walburn returned to the house, put the shotgun away and

> [s]aid he was sorry and, you know, and that—then that he loved everyone, and that the boy was driving him out, driving him bats or something like that and he put on his clothes and he got a drink and went out back.[6]

On September 8, 1972, the jury found Walburn guilty of murder in the second degree in violation of 22 D.C.Code §

---

1. Transcript of United States v. Walburn, Crim.No. 102–72 (hereinafter referred to as Transcript).

2. *Id.* at 247.

3. *Id.* at 248.

4. *Id.* at 251.

5. *Id.* at 251–252.

6. *Id.* at 108.

2403 (1967 ed.). That verdict was affirmed on appeal; James Walburn was incarcerated on February 4, 1974, and is currently in prison.

As a consequence of this killing, Mr. Earl M. Nalls, Jr., the brother and personal representative of "Corky" Nalls, instituted a civil tort action against James Walburn. In that suit, Civil Action No. 1843–72, now pending before this Court, Earl Nalls seeks damages for the "deliberate, wrongful, and negligent action of the defendant [Walburn], in causing the death of the decedent ["Corky" Nalls].[7]

Mr. Walburn has asked Travelers to defend him in the pending wrongful death action pursuant to a homeowners policy that Mr. Walburn had with Travelers.[8] Travelers initially agreed to defend that action with a reservation of rights.

Upon further evaluation of its policy with Mr. Walburn, Travelers determined that its policy did not encompass a death such as occurred in this instance. In its policy of insurance with Mr. Walburn, Travelers agreed to pay on behalf of its insured

> [A]ll sums which Insured shall become legally obligated to pay as damages because of bodily injury . . . to which this section applies, *caused by an occurrence.* (Emphasis added.)

It is the contention of Travelers that the killing of Mr. Nalls was not such an occurrence as would obligate the insurer under the plain terms of the policy. "Occurrence" is defined in the policy as

> [a]n accident . . . which results, during the policy term, in bodily injury neither *expected nor intended from the standpoint of the Insured.* (Emphasis added.)

Travelers has sought a declaratory judgment in this Court to determine the extent of Travelers' obligations to Walburn under this policy of insurance. The crucial and dispositive question for this Court to consider, therefore, is whether the killing of "Corky" Nalls was an accident "neither expected nor intended from the standpoint of the Insured." To reach this ultimate question, the Court must first address a fairly novel legal question in this jurisdiction concerning the applicability of collateral estoppel to the factual pattern of the instant case.

## II.  COLLATERAL ESTOPPEL.

It is the contention of the plaintiff that there are no genuine issues of material fact respecting the expectation or intent of Mr. Walburn in his shooting of "Corky" Nalls. This argument is grounded upon the theory that that issue was presented to the jury in Mr. Walburn's criminal trial and squarely decided by the jury when it found James Walburn guilty of second degree murder. Since the jury decided any question of intent or expectation against Mr. Walburn, Travelers argues, in this and any subsequent civil action Mr. Walburn is collaterally estopped from denying that he expected or intended the death of Nalls from his actions.

In past years many courts followed the rule that a judgment in a criminal proceeding was not admissible to establish any fact decided in a criminal trial.[9] However, that wall of exclusion has slowly but steadily been eroded in many varying factual contexts.[10] There are

---

7.  Complaint in Nalls v. Walburn, Civil Action No. 1843–72, at 1.

8.  Travelers Indemnity Homeowners Policy No. THO 7446662.

9.  *See, e. g.,* Washington National Insurance Co. v. Clement, 192 Ark. 371, 91 S.W.2d 265 (1936) ; Cope v. Goble, 39 Cal.App.2d 448, 103 P.2d 598 (1940) ; Nowak v. Orange, 349 Pa. 217, 36 A.2d 781 (1944) ; *see* annota-

tions at 51 A.L.R. 490 and 18 A.L.R.2d 1287, 1289 (1951).

10.  This trend has been summarized by one commentator as follows:

> The earlier cases justified the statement of a general rule to the effect that a judgment in a criminal case, whether of conviction or acquittal, was incompetent when offered in a civil case to prove the facts

now a great number of jurisdictions that hold that a criminal conviction can indeed preclude litigation of the same issue in a civil suit. *E. g.*, Breeland v. Security Insurance Co. of New Haven, Conn., 421 F.2d 918 (5th Cir. 1969); Bressan Export-Import Company v. Conlew, 346 F.Supp. 683 (E.D.Pa.1972); United States v. Fabric Garment Company, 366 F.2d 530 (2d Cir. 1966); Janney v. Arlan's Dept. Store, 247 F.Supp. 306 (W.D.Va.1965); Newman v. Larsen, 225 Cal.App.2d 22, 36 Cal.Rptr. 883 (1964); Travelers Ins. Co. v. Thompson, 281 Minn. 547, 163 N.W.2d 289, appeal dismissed and cert. denied 395 U.S. 161, 89 S.Ct. 1647, 23 L.Ed.2d 175 (1969); Taylor v. Taylor, 257 N.C. 130, 125 S.E. 2d 373 (1962); Eagle, Star and British Dominions Insurance Company v. Heller, 149 Va. 82, 140 S.E. 314, 57 A.L.R. 490 (1927); *see* Local 167 of International Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L. Ed. 804 (1934); Stagecrafters' Club,

Inc. v. District of Columbia Division of American Legion, 111 F.Supp. 127 (D. D.C.1953). The fact that the parties in the civil action are not the same as those in the criminal conviction has been held to be no bar to collateral estoppel. *See, e. g.,* Breeland v. Security Insurance Co. of New Haven, Conn., *supra*; Bressan Export-Import Company v. Conlew, *supra*, Hurtt v. Stirone, 416 Pa. 493, 206 A.2d 624 (1965).

Although the trend has clearly been to admit the criminal conviction in the subsequent civil action, the courts are in dispute as to what weight the conviction should be afforded in the civil action. The cases can be divided into two major categories in this regard. First, some courts hold that the judgment is received as conclusive evidence of the facts on which it was based.[11] The second group holds that the conviction is only *prima facie* evidence of the facts on which it was based and thus is rebuttable.[12] Generally, where the court

---

upon which it was based. The dissimilarity of parties, issues, procedures, etc., in short, the factors which prevented the application of such a judgment as res judicata, were offered as reasons for the rule of exclusion. * * * A large number of courts continue to apply the rule excluding a previous conviction offered, in a civil action, as evidence of the facts upon which it was based. * * *

However, an increasing number of decisions have approved the admission of such evidence, reasoning that the safeguards afforded the accused under criminal procedure are greater than those in a civil action, so that he has no cause for complaint that an adverse decision arrived at under such restraints should be used against him, especially where it is admitted only as prima facie evidence, subject to rebuttal. * * *

So far as is known, only one jurisdiction, Virginia, has admitted such a previous conviction as conclusive evidence, giving it in effect the force of an estoppel, and it may well be that even there this result will be reached only where the civil action is one in which the convicted criminal seeks to take advantage of a 'right' arising from the crime itself, as where the arsonist endeavors to collect the insurance upon the burned property. * * *

The logical basis for admitting evidence of convictions seems to be the same regardless of the type of conviction or civil action involved, although the strong public policy rule against permitting one to profit by his own wrong may furnish a more compelling reason for abandoning the previous rule.

18 A.L.R.2d at 1289, quoted in United States Fidelty & Guaranty Company v. Moore, 306 F.Supp. 1088 (N.D.Miss., 1969), at 1095 n. 16. Since this annotation many other courts have ruled that the criminal conviction may be admitted as conclusive evidence of the facts upon which the criminal conviction was based. *See* note 11, *infra,* and accompanying text.

11. Breeland v. Security Insurance Co. of New Haven, Conn., *supra;* Bressan Export-Import Company v. Conlew, *supra*; Eagle, Star and British Dominions Ins. Co. v. Heller, *supra;* Hurtt v. Stirone, 416 Pa. 493, 206 A.2d 624 (1965); Janney v. Arlan's Dept. Store, *supra;* Travelers Ins. v. Thompson, *supra;* Newman v. Larsen, *supra;* United States v. Salvatore, 140 F.Supp. 470 (E.D.Pa.1956).

12. Schindler v. Royal Ins. Co., 258 N.Y. 310, 179 N.E. 711, 80 A.L.R. 1142 (1932); Fidelity-Phenix Fire Ins. Co. v. Murphy, 231 Ala.

admits the criminal conviction as conclusive evidence of the facts upon which it was based, the facts often involve a convicted criminal seeking to avail himself of rights arising from the crime for which he has been convicted, e. g., where one convicted of arson seeks to collect on a fire insurance policy.[13]

Although this is not a case where the convicted criminal seeks directly to benefit from his unlawful deeds, the Court does believe that this is a case in which the evidence of the criminal conviction can be admitted as conclusive proof of Mr. Walburn's expectations or intent in regard to the killing on September 17, 1971, if it can be shown that the exact same issue in this case, i. e., whether Walburn expected or intended to injure "Corky" Nalls, was clearly decided in the prior criminal trial. Whether the jury in the criminal trial did make a clear finding in this connection will be discussed, infra. For present purposes it is necessary to set forth the policy on this subject to illustrate the reason the Court feels the evidence can be admitted as conclusive thus making summary judgment appropriate and precluding the necessity of trial.

The only case the Court has been able to find in this jurisdiction concerning collateral estoppel in relation to the utilization of a criminal conviction in a civil trial is Stagecrafters' Club, Inc. v. District of Columbia Division of American Legion, 111 F.Supp. 127 (D.D.C. 1953). In that case,[14] Stagecrafters' Club, an "after hours club" was the lessee of certain property. Stagecrafters' interest in the property had been sold at public auction to pay for overdue taxes. At trial, a dispute apparently arose respecting whether Stagecrafters' had breached its lease with the original les-

sor, Washington Housing Corporation. In that lease, it was agreed that the premises were not to be used for any unlawful or disorderly purpose. Subsequently, however, Stagecrafters' and its president were convicted and their conviction affirmed, for selling liquor on the premises without a license. In the civil suit that followed, where Stagecrafters' claimed a right to possession of the premises claiming the lease was still in full force and effect, it became a central question as to whether the criminal conviction was admissible as proof of breach of the lease.

In addressing this question, Judge Keech of this Court held that

[w]here the issue in the criminal case was clear, the defendant appeared, was represented by counsel, had an opportunity to testify and present his witnesses and to cross-examine the witnesses against him, and was duly convicted, there is no sound reason why the judgment of conviction should not be admitted in a civil case based on the same facts as at least prima facie evidence of those facts.

111 F.Supp. at 129.

Although admitting the evidence as prima facie evidence, the Court found that in light of the failure of plaintiff to rebut the evidence, the convictions were conclusive proof of breach of the lease.

One very recent case is worthy of mention as indicative of the trend of the law in connection with collateral estoppel. In Bressan Export-Import Company v. Conlew, 346 F.Supp. 683 (E.D.Pa. 1972), the plaintiff, the owner of a shipment of hijacked shoes, sued in conversion two persons, one of whom was convicted of receiving and possessing the

---

680, 166 So. 604 (1936), cert. denied, 299 U.S. 557 (1936); see also Stagecrafters' Club, Inc. v. District of Columbia Division of American Legion, supra; United States Fidelity & Guaranty Co. v. Moore, supra.

13. See, e. g., Eagle, Star and British Dominions Insurance Co. v. Heller, supra; Bree-

land v. Security Insurance Co. of New Haven, Conn., supra.

14. The facts of Stagecrafters' Club are found at D.D.C. 110 F.Supp. 481.

stolen goods. The Court granted summary judgment against the defendant who had been convicted in the criminal trial admitting that conviction as conclusive proof of conversion.

The *Bressan Export-Import* case is one where the conviction was admitted as conclusive evidence making summary judgment appropriate even though the convicted criminal was not seeking to take advantage of his wrongdoing as in the arson fire insurance cases. This Court can see no valid policy rationale in distinguishing those cases where the conviction is admitted as conclusive evidence to prevent the criminal from benefitting from his crime and this case where a person convicted of second degree murder seeks to have an insurance company assume liability for that act.

The policy reasoning of the *Stagecrafters'* case, the *Bressan Export-Import* case, and other cases not following the traditional rule of exclusion [15] was stated succinctly by the Court in *Stagecrafters'*:

> . . . common sense and good judicial administration dictate that the civil court shall not retry at length, more than two years after the occurrence, issues which were fairly determined in the criminal proceeding, when the evidence was fresh, by a competent tribunal after full litigation by the party against whom the conviction is offered in evidence.

111 F.Supp. at 129.

This rationale has been followed in many cases where collateral estoppel has been applied,[16] and it appears to this Court that such reasoning is equally applicable in the case *sub judice*. If the criminal jury found beyond a reasonable doubt that James Walburn by his acts either expected or intended to injure "Corky" Nalls, it would be an exercise in futility for this Court to retry the same issues. This is especially true where the civil burden is only by a preponderance. Moreover, a trial where such a conviction would only be admitted as *prima facie* evidence would also be fruitless without some evidence of fraud or perjury or some like transgression at the original criminal trial. Inasmuch as the Court of Appeals has affirmed Walburn's convictions, it is safe to say that errors, if any, that occurred at the criminal trial were insufficient to warrant setting aside the jury's determination. Upon review of the transcript of that trial, the Court is convinced that Walburn received a fair trial, including a vigorous defense thus meeting the criteria quoted from *Stagecrafters'* and the criteria generally examined by the courts in considering the question of the use of criminal convictions at subsequent civil trials.

Therefore, in light of this Court's conclusion that this conviction can be admitted as conclusive evidence of the facts upon which it was based, it only remains to determine whether the conviction was clearly grounded upon a finding that James Walburn intended or expected to do serious bodily injury to "Corky" Nalls on September 17, 1971. If such a determination can be made, summary judgment is appropriate due to the absence of any genuine issue of material fact regarding intent or expectation.[17]

### III. MALICE.

As noted previously, the question of coverage in this case rises or falls on whether the killing was an accident

15. See note 11, *supra*, and accompanying text.

16. *Id.*

17. Summary judgment has been found an appropriate remedy in similar cases. Breeland v. Security Insurance Co. of New Haven, Conn., 421 F.2d 918 (5th Cir. 1969); Bressan Export-Import Company v. Conlew, 346 F.Supp. 683 (E.D.Pa.1972); United States Fidelity & Guaranty Company v. Moore, 306 F.Supp. 1088 (N.D.Miss., 1969); Newman v. Larsen, 225 Cal.App.2d 22, 36 Cal.Rptr. 883 (1964).

"neither expected nor intended from the standpoint of the Insured." In construing the terms of this policy the Court is bound by the general rule that where an insurance policy is ambiguous and susceptible of two or more interpretations, the policy must be construed in the light most favorable to the insured. Stinson v. New York Life Ins. Co., 83 U.S.App. D.C. 115, 167 F.2d 233 (1948); Continental Casualty Company v. Beelar, 132 U.S.App.D.C. 1, 405 F.2d 377 (1968); Buchanan v. Massachusetts Protective Association, 96 U.S.App.D.C. 144, 223 F.2d 609 (1955). However, the Court cannot find that this exclusion is in any way ambiguous. The language, an accident "neither expected nor intended from the standpoint of the Insured," means simply that if Mr. Walburn either intended to do serious bodily injury to "Corky" Nalls or expected such a result from his actions, then there is no coverage. It is apparent to the Court that the question of whether the jury in the criminal trial found such intent or expectation is inextricably intertwined with their finding of malice.

■■ It is equally apparent to this Court that the jury in the criminal trial could not have returned a verdict of second degree murder unless they made the clear determination that the killing was with malice. Judge Robinson instructed the jury that malice was an essential element of second degree murder.[18] If in

18. Judge Aubrey Robinson's instruction in this regard, not challenged on appeal, was, in pertinent part, as follows:

Murder in the second degree may be committed either with or without any purpose or intent to kill if the killing is accompanied by malice, and I will define malice for you in a moment.

The essential elements of the offense of murder in second degree are two and they are these: One, that the defendant James Walburn in the District of Columbia inflicted a wound or wounds upon John Corky Nalls from which the said John Corky Nalls died, and you have heard the evidence with respect to the first essential element of the offense of second-degree murder, so I don't think I have to comment any further on that.

The second essential element of the offense of second-degree murder is that the defendant James Walburn acted with malice.

Now, in its ordinary and everyday sense, malice would indicate the feeling of hatred or ill-will of one person towards another, or a feeling of hostility by one person towards another, but in its legal sense malice has a broader significance: Malice legally does not necessarily imply ill-will or spite or hatred or hostility by a defendant towards the person killed. Legally malice is a state of mind showing a heart regardless of the life or safety of others, a mind deliberately bent upon mischief, a generally depraved and wicked and malicious spirit.

Malice as the law knows it may be defined as the condition of mind which prompts a person to do a wrongful act wilfully, that is on purpose, to the injury of another, or to do intentionally a wrongful act towards another without justification or excuse—a wrongful act whose foreseeable consequences is death or serious bodily injury.

Malice may be express or it may be implied. Express malice under the law exists where one kills another in pursuance of a wrongful or unlawful purpose without legal excuse. Implied malice is such as may be inferred from the circumstances of the killing, as, for example, when the killing is caused by the intentional use of fatal force without circumstances serving to either mitigate or to justify the infliction of fatal force.

Now, in determining whether the wrongful act whose foreseeable consequence is death or serious bodily injury is intentionally done without justification or excuse, and is therefore done with malice aforethought, you should bear in mind that it may be inferred that normally a person intends the natural and probably [sic] consequences of his own acts, but you are not required so to infer. As I have already told you, intent may be deduced from all of the facts and circumstances that you find from the evidence.

Malice may be inferred when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard for human life—such acts which result in the death of another human being—but you are not required so to infer.

The instrument or the means by which a homicide is committed is always to be taken into consideration in determining

so finding malice the jury must necessarily have found that Walburn intended to do serious bodily injury to "Corky" Nalls or expected that such would result from his actions, then Mr. Walburn is collaterally estopped from denying any presence of intent or expectation in this proceeding.

The Court cannot without hesitation say the criminal trial jury found Walburn intentionally shot "Corky" Nalls. In Thomas v. United States, 136 U.S. App.D.C. 222, 224, 419 F.2d 1203, 1205 (1969),[19] it was noted that

> [U]nder the law an accidental killing may be second degree murder, manslaughter, or no crime at all, depending on the degree of recklessness involved. (Footnote omitted).

Thus, although a second degree murder may be an accident, this does not resolve the question of coverage since the insurance policy is written in the disjunctive; there is only coverage if the occurrence was neither intended nor expected. Although this second degree murder may have been unintended, the Court reaches the inescapable conclusion that a second degree murder conviction could only have been returned by the jury if they found that Walburn expected that serious bodily injury would be the result of his actions; such a result is inherent in the finding of malice.

Malice has been defined in many cases but the scope of the term has been best described in Belton v. United States, 127 U.S.App.D.C. 201, 204–205, 382 F.2d 150, 153–154 (1967):

> Malice is an ultimate fact that can rarely be proved by direct evidence. It is both desirable and necessary to instruct the jury that they may infer the existence of malice from other evidentiary facts, including the deadly nature of the weapon utilized . . . . Malice may be established by reference to either of two standards: One, a subjective standard—whether the defendant actually intended or foresaw that death or serious bodily harm would result from his act; and the other, an objective, "reasonable man" standard—whether the defendant should have foreseen that such result was likely . . . . (Footnotes omitted.)

*See also* Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967); United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

If the jury in the Walburn criminal trial used either one of the standards described in *Belton,* and they were so instructed by Judge Robinson, then they either found intent to do serious bodily injury or at least under the "reasonable man" objective standard found that Mr. Walburn must be held to have foreseen such a result as likely. As this Court interprets the clear terms of the exclusionary clause, the latter finding is tantamount to a decision that the injury was *expected* from Mr. Walburn's view-

---

whether the act is criminal and, if so, in what degree. If in a prosecution for homicide, and this is one, it is shown that the accused used a deadly weapon in the commission of a homicide, malice may be inferred from the use of such weapon, but you are not, again, required to infer this malice. You are instructed as a matter of law that a loaded shotgun is a deadly weapon.

Transcript 395–398. As noted, this instruction was not challenged on appeal and appears to avoid the pitfalls included in pre-

vious malice instructions. *See* Green v. United States, 132 U.S.App.D.C. 98, 405 F.2d 1368 (1968); United States v. Wharton, 139 U.S.App.D.C. 293, 433 F.2d 451 (1970); United States v. Perkins, Crim.No. 71–1804 (D.C.Cir. May 28, 1974).

19. *See also* Lee v. United States, 72 App.D.C. 147, 149, 112 F.2d 46, 48 (1940); *See generally* Perkins, A Re-Examination of Malice Aforethought, 43 Yale L.J. 537 (1934).

point thus removing any obligation of Travelers under the policy.[20]

Defendants rely essentially on two cases with regard to intent, only one of which the Court feels is sufficiently on point to warrant extensive discussion.[21] In Burd v. Sussex Mutual Insurance Company, 56 N.J. 383, 267 A.2d 7 (1970), the insured, Burd, wounded one D'Agostino. Burd was convicted of atrocious assault and battery. Thereafter, D'Agostino sued Burd. Burd's insurance policy excluded coverage of "bodily injury or property damage caused intentionally by or at the direction of the insured." 267 A.2d at 9. The insurance carrier refused to defend and D'Agostino won a judgment of $8,500. In the case under discussion, Burd sues to recover the $8,500. Finding that the insurer was not entitled to judgment as a matter of law because the insured was convicted of atrocious assault and battery, the Court based its decision on the fact that it was not clear whether intent had been actually decided below:

> We could not say collateral estoppel would be appropriate here even as to the insured. Since the record on this appeal did not reveal the issues actually tried in the criminal case, we could not be sure the jury found facts decisive with respect to the insurance controversy.

267 A.2d at 15.

In marked contrast to that case, in the instant suit it is abundantly clear from the record in the criminal trial that the jury did squarely meet the question of expectation or foreseeability, the central and only question in this suit, and decided that issue against Mr. Walburn.

## IV. CONCLUSION.

In summary, the Court believes that justice is served by the granting of summary judgment to Travelers in this case. Mr. Walburn had ample opportunity at his criminal trial and on appeal to present evidence and argument relating to his actions in shooting "Corky" Nalls. Where one has been accorded the full panoply of rights that are the concomitants of a criminal trial, it is only sensible that if an issue is necessarily decided in the criminal case it should be accepted as conclusive proof in a subsequent civil proceeding where that issue is dispositive.

Accordingly, it is by the Court this 27th day of June, 1974,

Ordered, adjudged, and decreed that plaintiff is not obligated to defend James R. Walburn in any action arising from the shooting of John T. Nalls, II, nor to indemnify the said James R. Walburn for any liabilities subsequently arising therefrom.

20. Assuming the jury found implied malice, such a finding would without question indicate a finding of expectation to do harm. "Implied" malice was accepted in Logan v. United States, 133 U.S.App.D.C. 365, 367, 411 F.2d 679, 681 (1968), as being that which
   [m]ust be such as may be inferred from the circumstances of the killing. It must be such as flows from an act which imports danger to another, done so wantonly as to manifest depravity of mind and disregard of human life.

21. Lyons v. Hartford Insurance Group, 125 N.J.Super. 239, 310 A.2d 485 (1973), relied on by defendants, not only does not involve questions of insurance coverage where the insured was guilty of second degree murder, there was not even discussion of a criminal conviction upon which the court could have relied in determining the intent of the insured. The finding of Lyons upon which defendants primarily rely is that coverage does indeed exist under a clause very similar to that at issue here for the unintended results of an intentional act. 310 A.2d at 488.

Defendants argue that Mr. Walburn may have intended to pull the trigger but did not intend any result of injury thus bringing the act within the coverage of the policy. In view of this Court's finding that "expectation" is the word which is dispositive in a case where the criminal jury has found malice, it is unnecessary to determine de novo whether Mr. Walburn intended to injure Nalls. It has already been determined by the criminal jury in finding malice that Walburn expected or must be held to have expected that injury would be the result of his act.