**James H. THOMAS, Jr., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 22055.**

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 16, 1969.

Decided Nov. 17, 1969.

---

Messrs. Stephen N. Shulman and Charles D. Reed, Washington, D. C. (both appointed by this court), for appellant.

Mr. Edwin K. Hall, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry and Theodore Wieseman, Asst. U. S. Attys., were on the brief, for appellee. Mr. David G. Bress, U. S. Atty. at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

PER CURIAM:

Appellant was tried for and convicted of second degree murder and carrying a dangerous weapon. On this appeal he makes three points: (1) the trial court's extensive cross-examination of appellant before the jury was prejudicial; (2) the prosecutor in summation misrepresented the testimony of a Government witness in an area crucial to his case; and (3) no charge on involuntary manslaughter was given the jury in spite of his defense that the killing was accidental.

On May 5, 1967, appellant drove to the 11th Precinct Police Station and told Officer Allen: "There is a body in the front seat of that car. You can see if you want to go and look." Officer Allen looked into the car and saw the body of a woman lying on the front seat. On being asked "what happened" by Officer Allen, appellant responded, "I shot her." Whereupon he was placed under arrest for murder.

On trial the details of an extramarital relationship between appellant and his victim, Mrs. Hawkins, were exposed. The theory of the Government's case was that appellant shot Mrs. Hawkins when she sought to end that relationship, while appellant testified that it was he who tried to end the affair and that Mrs. Hawkins was accidentally shot in a scuffle between them for a pistol she was carrying in her pocketbook.

I

As the Government admits in its brief, "the trial judge conducted a lengthy examination of appellant" extending without interruption over eight and a half pages of transcript. Part of this examination suggested the impropriety of appellant's relationship with Mrs. Hawkins and questioned his desire to bring that relationship to an end.[1] While this ex-

---

1. The transcript, at pages 130 to 133, reads:

Q [by the court]. Now you say that you were together for a two-year period.
A. Yes, Your Honor.
Q. Did you testify to the jury that there came a time when you wanted to discontinue the relationship?
A. Yes, Your Honor.
Q. Now, did you just stay away from her at any time?
A. Yes, Your Honor.
Q. All right, when?
 *  *  *  *  *
Q. All right. Now the ladies and gentlemen of the jury are interested, and you are the only one that can explain to the ladies and gentlemen of the jury. Did you ever stay away from her?
 *  *  *  *  *
Q. All right. Will you answer the question for the jury. Did you ever stay away from her?

A. Yes, I did.
Q. All right, when?
A. This was in March, the Sunday that we left the hotel, I stayed away from her, didn't call from seven days to a week before she got in contact with me again.
Q. All right, was there any force exerted on you to see her?
A. No, it wasn't, Your Honor.
Q. Now you have a wife and two children?
A. Yes, Your Honor.
Q. All right. You knew that she had the husband and four children.
A. Yes, Your Honor.
Q. Now this went on for a two-year period?
A. Yes, Your Honor.

amination alone may not constitute reversible error, we cannot say with assurance that it did not prejudice appellant, to some extent at least, in the eyes of the jury. *Compare* United States v. Barbour, 137 U.S.App.D.C. ——, 420 F.2d 1319 (decided October 9, 1969).

## II

■ Appellant's second point relates to an alleged misrepresentation of the testimony of a Miss Dickerson, a co-worker of the deceased at St. Elizabeths Hospital where appellant also had worked. The suggestion is that in summation the prosecutor distorted the co-worker's testimony to show that appellant had lied on the witness stand about the unavailability of a telephone in the lobby of the hospital through which he is alleged to have threatened the life of Mrs. Hawkins. While the prosecutor's argument certainly is susceptible to that interpretation and to that charge, another interpretation involving no distortion of Miss Dickerson's testimony is likewise permissible.[2] Thus at most the prosecutor's argument on this point was equivocal. Moreover, there is no indication that the prosecutor intended to misrepresent the witness' testimony or mislead the jury.

## III

Appellant primarily relies for reversal on the failure of the trial court to instruct on involuntary manslaughter, arguing that the only issue on trial was whether the gun went off accidentally and that the trial court failed to provide the jury with any guidance whatever on this crucial point. There was, of course, evidence on which the jury could have found that the homicide was accidental. Indeed, that was appellant's only defense, in support of which he testified at length.

■ Under the law an accidental killing may be second degree murder, manslaughter,[3] or no crime at all, depending on the degree of recklessness involved. Thus, as the trial court charged the jury in this case, second degree murder may consist of an unintentional killing where the "act which imports danger to another is one so reckless or so wrongful as to manifest depravity or a depraved mind and disregard of human life." There is no way, of course, to tell whether the jury's verdict of second degree murder was based on this part of the charge.

■■ Nor do we know whether the jury would have found appellant guilty

2. In his summation the prosecutor stated:
   And who do they see coming out of the lobby downstairs. They see James Thomas [appellant] coming out of the lobby, where they have a telephone.
   What does the defendant tell you about that? It could not have happened. Why? Because the door is locked downstairs. 'I couldn't have gotten into the lobby.'
   Now, Miss Dickerson got on the stand and told you that is not so. The door is open. It is open for patients to walk in and out any time during the day.
   Now, again, I suppose Miss Dickerson was telling you a lie. What her motive would be is not clear. She is a co-worker.
   Miss Dickerson had testified on direct examination for the Government:
   Q [by the prosecutor] Will you tell us about the access to that building during the daytime?
   A The door to the lobby on the first floor was open from 6:00 in the morning

to 6:00 in the evening. Some patients can have access to the lobby.
   Q There is no telephone in that lobby?
   A No.
   Another co-worker had testified, however, that there was a telephone in the lobby. Thus there was support in the record for the prosecutor's statement that a telephone was in the lobby, and Miss Dickerson did testify, contrary to appellant, that the door to the lobby was kept open.

3. It has long been held in the District of Columbia that manslaughter may result from an accidental or unintentional act. *See* Story v. United States, 57 App.D.C. 3, 16 F.2d 342, 53 A.L.R. 246 (1926). *Compare* 40 D.C.Code § 607 (1967). *See also* Judge Leventhal's concurring opinion in United States v. Dixon, 135 U.S. App.D.C. ——, 419 F.2d 288 (decided March 27, 1969), for a comprehensive discussion of the subject.

of involuntary manslaughter,[4] rather than second degree murder, if given the opportunity.[5] In fact, it is possible that, under proper instructions concerning responsibility for accidental death, the jury would have found appellant not guilty. Under the circumstances, since the question of accidental death was the only contested issue in this case and the jury received no guidance on this issue from the trial court, we are constrained to reverse this conviction for a new trial under proper instructions.[6] *See* McDonald v. United States, 109 U.S.App.D.C. 98, 284 F.2d 232 (1960); Rule 52(b), Fed. R.Crim.P.

So ordered.

---

4. In its brief the Government argues that an instruction on involuntary manslaughter was unnecessary because

> "there was ample testimony by witnesses to the effect that appellant had expressed his intent to kill the deceased in their presence. This, coupled with the important fact that a deadly weapon was used in the slaying, thereby creating an implication of an intentional action on appellant's part, would rule out the use of an involuntary manslaughter instruction in this case."

But this argument credits only the prosecution's evidence and ignores entirely the testimony of appellant. Such a one-sided view of the evidence is obviously improper. As the New York Court of Appeals recently said:

> "We have repeatedly written that if, 'upon any view of the facts, a defendant could properly be found guilty of a lesser degree or an included crime, the trial judge must submit such lower offense.' * * * A classic statement of the standard to warrant a refusal to submit lesser degrees or included crimes is that 'every possible hypothesis' but the higher crime be excluded. * * * That an acquittal may have been the only permissible verdict had the jury credited the testimony of the accused is of no consequence. * * *"

People v. Asan, 22 N.Y.2d 526, 529, 293 N.Y.S.2d 326, 328, 239 N.E.2d 913, 914 (1968). (Citations omitted.) In *Asan* the New York Court of Appeals held that a conviction of statutory first degree manslaughter had to be reversed because of the trial judge's refusal to instruct on second degree manslaughter.

5. As Judge Leventhal said in United States v. Dixon, *supra* Note 3:

> "I respectfully submit that the customary instructions stand the law of criminal homicide on its head when they use recklessness as the basis of verdict only in the instruction on second degree murder, and omit an instruction for a manslaughter verdict based on criminal negligence."

135 U.S.App.D.C. at ——, 419 F.2d at 291.

6. This court has recently affirmed manslaughter convictions in two second degree murder cases involving attacks on the sufficiency of manslaughter instructions which were not objected to at trial. Both cases can clearly be distinguished from the present case. In United States v. Dixon, *supra* Note 3, the trial judge gave the "heat of passion" manslaughter instruction but failed to instruct the jury on involuntary manslaughter. He did charge that the jury could not convict if it found the shooting to be accidental. The jury rejected the possibility of accidental death and convicted the defendant of manslaughter. Since on the facts the jury could properly have returned the verdict which it did, and appropriate instructions on involuntary manslaughter at best could only have resulted in the same verdict, we held that any possible error in the manslaughter instruction must have been without prejudice to the defendant.

We also affirmed a conviction of manslaughter in United States v. Carter, 136 U.S.App.D.C. ——, 420 F.2d 150 (decided October 14, 1969), in spite of allegedly inadequate instructions to which no objection was raised at trial. But in *Carter* the issue of accidental death was squarely presented to the jury; the court instructed the jury on second degree murder arising from recklessness, voluntary manslaughter, involuntary manslaughter arising from negligence, and accidental death. Since the jury in *Carter* was given some guidance on involuntary manslaughter and accidental death, the deficiencies in the charge did not amount to "plain error."

Thus in both *Dixon* and *Carter* where the charge was second degree murder and the defendant was convicted of manslaughter, the jury was charged, however inadequately, on accidental death. Here the charge was second degree murder and the jury convicted appellant of that crime on instructions that did not cover involuntary manslaughter or accidental death, the only contested issue in the case.