**UNITED STATES of America**

v.

**Albert COX, a/k/a Albert C. Smith.**

**No. 73–1571.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 5, 1974.

Decided Dec. 18, 1974.

Melvin Richter, Washington, D. C. (appointed by this Court), for appellant.

James M. Hanny, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief for appellee. Harold H. Titus, Jr., U. S. Atty. at the time the record was filed and James F. McMullin, Asst. U. S. Atty., also entered appearances for appellee.

Before FAHY,* Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

On this appeal from a conviction of murder in the second degree, appellant contends that the evidence is insufficient to sustain the verdict and that receipt in evidence of his statement to the police violates the rule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We reject these contentions, and we affirm.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant was convicted of the murder by shooting of Joseph Jackson, who was found dead on the evening of February 17, 1972, in appellant's apartment. According to the testimony of William E. Wilkins, various persons had gathered in the apartment in the course of that day. Wilkins was standing by the door watching Jackson and another man playing checkers when he heard appellant shout, "I mean everybody." Turning, Wilkins saw a gun in appellant's hand. He

heard three shots fired and was hit by two of them. Appellant was subsequently arrested, as a result of Wilkins' identification, on a charge of assault with a deadly weapon.

While appellant was in the custody of the police Jackson's body was found lying on the floor of appellant's living room. He had suffered massive internal hemorrhaging due to a gunshot wound in the abdomen. The Deputy Medical Examiner for the District of Columbia testified that the time between Jackson's injury and his death was two to three hours and that the gun had not been fired at close range.

In a statement taken by homicide officers at police headquarters on the night of the incident, appellant said that he had been carrying a gun because he feared a confrontation with a group of ten or eleven people who were drinking in the hall. He stated that they attacked him in the hall as he was returning from tending the furnace, that someone took the gun from his hand, and that "the gun went off and shot somebody" in the course of the struggle to retrieve it.

Appellant urges that the evidence presented by the prosecution is insufficient to establish that he shot Wilkins or that Jackson was fatally injured at the time Wilkins was shot. We cannot say that there is no evidence upon which a reasonable mind might fairly conclude that appellant is guilty beyond a reasonable doubt. See United States v. Lumpkin, 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971). The Government's evidence is largely circumstantial, but that is no bar to its sufficiency. United States v. Fench, 152 U.S.App. D.C. 325, 333, 470 F.2d 1234, 1242 (1972). Much of appellant's challenge turns on the credibility of Wilkins, the Government's chief witness. Appellant asserts Wilkins was too intoxicated at the time of the shooting and could not accurately perceive what occurred. The weight to be given to Wilkins' testimony falls

* Judge Fahy did not participate in the decision of this case.

within the province of the jury and will not be reviewed on appeal. Orient Mid-East Lines, Inc. v. Cooperative for American Relief Everywhere, Inc., 133 U.S.App.D.C. 307, 310, 410 F.2d 1006, 1009 (1969).

█ Appellant also argues that the Government failed to establish a prima facie case of second-degree murder because it presented no evidence that appellant acted with malice aforethought and not in the heat of passion. Appellant is in error in supposing that "malice" requires the application of a subjective standard of intent to kill. Even in the absence of subjective intent to kill, "malice" may be determined by application of an objective standard, where conduct is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.[1]

## II. THE ADMISSIBILITY OF APPELLANT'S STATEMENTS MADE WHILE IN THE CUSTODY OF THE POLICE

Appellant challenges the receipt in evidence of his statements to the police on the night of the shooting, on the ground that he lacked the capacity at that time to make a knowing and intelligent waiver of his rights under Miranda v. Arizona, *supra*.

At 7:30 p. m., when appellant was first taken to the stationhouse, he was interviewed with regard to a charge of assault with a deadly weapon. At that time he was advised of his rights by Officer Pawlick, who read him the standard Form PD–47. Appellant signed the waiver on the form. In this interview appellant gave the police three .22 caliber bullets that he had in his coat pocket. An hour later, when the police became aware that a possible homicide was involved, appellant was again advised of his rights, this time by Sergeant Murray of the Homicide Unit, and he again signed the waiver on a PD–47 Form. At 9:30, in the Homicide Unit, appellant was advised of his rights for a third time, by Detective Hill, who gave him a PD–47 Form to read and sign before taking a statement.

First, appellant argues that, although he was given repeated warnings, he did not comprehend their significance because he had only a fifth-grade education. At a hearing on the admissibility of the statements the trial judge asked appellant to read the PD–47 Form aloud and to discuss his understanding of its contents. On this basis the court reasonably concluded that appellant was capable of understanding the warnings and had in fact understood them.

Appellant also urges that he lacked the capacity to make a knowing waiver because he was intoxicated at the time of the interrogation. The record supports the trial judge's finding that appellant's statements were voluntary. The three police officers who interviewed appellant testified that, although appellant had been drinking, there was no indication that he was too intoxicated to understand the warnings. No testimony was offered by appellant in support of his assertion that he was too intoxicated to grasp the significance of his waiver.[2]

█ Indeed, appellant repeatedly testified that he understood all the warnings read to him and that he knew what his rights were. (Tr. 218–22). He

---

1. The pertinent doctrine was set forth in United States v. Dixon, 135 U.S.App.D.C. 401, 406 n. 8, 419 F.2d 288, 293 n. 8 (1969) (concurring opinion), and subsequently in Thomas v. United States, 136 U.S.App.D.C. 222, 419 F.2d 1203 (1969), and United States v. Dent, 155 U.S.App.D.C. 278, 477 F.2d 447 (1973).

2. In fact, appellant concedes on appeal that he was presumably not intoxicated at the time Detective Hill took his statement. (At Br. 34). Yet, at the trial court the question of the sufficiency of appellant's waiver was raised only with regard to this statement. Appellant's counsel expressly disavowed any objection to the statement in which appellant gave the bullets to Pawlick and Murray. (Tr. 162).

testified that he made his statements because he was "taught to tell the truth" to police officers. (Tr. 323). An avowed conscious desire to cooperate with the police is not the sort of compulsion that undermines voluntariness. Rather, it fully supports the conclusion that appellant's waiver was knowing and intelligent. We see no justification for reversing the ruling of the trial judge.

■ We discern no prejudicial error and affirm the judgment of the District Court.[3]

Affirmed.

LEVENTHAL, Circuit Judge (concurring):

In the course of reviewing the record for the purpose of preparing the court's opinion, I came to be concerned with a problem in the trial judge's instructions to the jury on recklessness as a basis for culpability under the criminal law of homicide. These instructions were not made the subject of any objection in the trial court, or complaint in this court, and we ultimately decided that the problem is not one that is either central to the facts of this case or warrants interjection by the appellate court under the rule contemplating reversal for plain and prejudicial error. But the judicial reflection I have provided, in the course of fulfilling my responsibility as a judge to determine whether there was plain error that would warrant reversal even in the absence of objection by counsel, may be helpful to other judges faced with this recurring problem, and hence I follow my practice of attaching to the opinion I have authored for the court, a separate, concurring opinion in which I speak only for myself.

As appears from the *Dixon-Thomas-Dent* line of cases, cited in footnote 1 of the court's opinion, recklessness may be the basis for a determination of culpability for murder (malice) or involuntary manslaughter. The applicable doctrine [1] may be summarized as follows:

Conduct that evinces unreasonableness or negligence but falls short of recklessness is insufficient to support a verdict of either manslaughter or second-degree murder. A manslaughter verdict requires a showing of conduct that is reckless, that "involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." A murder verdict is justified only when defendant's conduct is so reckless as to establish "malice." The term malice is frequently described in terms of "wanton disregard for human life," but can be more precisely formulated as requiring an awareness of a serious risk of death or serious bodily injury. The distinction between involuntary manslaughter and murder lies in the quality of the defendant's awareness of the risk. United States v. Dixon, *supra*, 135 U.S.App.D.C. at 406, 419 F.2d at 293; United States v. Grady, 157 U.S.App. D.C. 6, 8–9, 481 F.2d 1106, 1108–09 (1973).

The District Judge gave the instructions on the recklessness elements of criminal homicide that appear in the Bar Association's compilation of instructions in the so-called "red book." This led to the jury's being instructed in the following terms:

Implied malice [which would support a verdict of second-degree murder] . . . may be inferred from the circumstances of the killing, as, for example . . . when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life. (Tr. 325)

---

3. We need not consider the possibility that there may have been error in the instructions on recklessness as a basis for criminal responsibility for homicide. There was no objection, in either the trial court or this court, and hence there is no warrant for reversal unless the rigorous requirements of the "plain error" rule are met. Even assuming for discussion that there was error, there was no substantial prejudice.

1. *See, e. g.,* United States v. Poole, 161 U.S. App.D.C. 289, 297, 495 F.2d 115, 123 (1974); United States v. Ammidown, 162 U.S.App. D.C. 28, 37, 497 F.2d 615, 625 (1973).

394

Later, after lengthy and complex instructions on provocation and certain elements of manslaughter, they were told to find the defendant guilty of manslaughter if the Government proves

> that the defendant's conduct amounted to a conscious disregard of a substantial and unjustifiable risk to the life of the deceased and a gross deviation from the standard of conduct that a reasonable person should have observed under the circumstances. Whether the conduct is reckless depends upon whether a reasonable person would have been aware or should have been aware of the extreme danger involved in his actions. (Tr. 328)[2]

What concerns me is that such widely separated passages may not be sufficient to present the difference in offenses in terms meaningful to a jury of laymen. The judge referred to awareness of danger in giving the manslaughter instruction, whereas what was really needed was an instruction that drew the difference between manslaughter and murder in terms of the nature of defendant's awareness of risk.[3] Guidance to the jury would also have been heightened by an explicit statement that a finding of unreasonableness and negligence is not in itself enough to constitute the recklessness required for manslaughter.

To crystallize my reflections, and perhaps enhance their usefulness, I have put in the margin a suggested instruction for consideration as a concluding, or summarizing, instruction in cases involving the possibility of a verdict of criminal homicide based on defendant's recklessness.[4]

As this case went to the jury it turned, not on appellant's state of mind, but on whether the Government had established that he had in fact shot Jackson without any legal justification. Since the instruction on state of mind was technically accurate as given and the problem is one of clarity and emphasis, and since the facts do not really turn on the state of mind issue, this is not a case for invoking the rule that permits reversal, even in the absence of objection, for error that is plain and prejudicial.

2. Instructions 4.23 and 4.26 of the red-bound Criminal Jury Instructions prepared by the Young Lawyer's Section of the District of Columbia Bar Association.

3. Confusion rather than clarification is imparted by the passage in the manslaughter instructions referring to "a conscious disregard of a substantial and unjustifiable risk to the life of the deceased." (Tr. 328). Such language belongs in the murder instructions.

4. In summary, the question of whether defendant is guilty of involuntary manslaughter, or second-degree murder, turns on whether his conduct constitutes recklessness, and if so, what kind.

The fact that defendant's conduct was a deviation from the standard of care that a reasonable person would observe in the same situation shows negligence, but if it does not go further and show recklessness, you must bring in a verdict of not guilty on all counts.

You may conclude beyond a reasonable doubt that defendant's conduct was not merely negligent, but also reckless, if it was a *gross* deviation from a reasonable standard of care and created a serious risk of death or serious bodily injury. In that case you may find defendant guilty of involuntary manslaughter or second-degree murder, depending on his awareness of the risk created by his conduct. If defendant was not aware of a serious risk of death or serious bodily injury, he may be found guilty of involuntary manslaughter but not of murder. If you find beyond a reasonable doubt that defendant was aware of a serious risk of death or serious bodily injury, you may find him guilty of second-degree murder, for in that case his conduct may be deemed to indicate an extreme and wanton disregard for human life.