UNITED STATES of America,
Plaintiff-Appellee,

v.

Francis E. SPRINGFIELD,
Defendant-Appellant.

No. 86–3225.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 7, 1987.

Decided Oct. 6, 1987.

Kelly J. Varnes, Billings, Mont., for defendant-appellant.

Byron H. Dunbar and Klaus P. Richter, Billings, Mont., for plaintiff-appellee.

Before FARRIS, ALARCON and WIGGINS, Circuit Judges.

FARRIS, Circuit Judge:

Francis Springfield appeals his conviction of 1) involuntary manslaughter, 2) being a felon in possession of a firearm, and 3) using a firearm in a crime of violence in connection with a shooting death that occurred on the Crow Indian Reservation in south central Montana on July 19, 1986. Springfield is an enrolled member of the Crow Indian Tribe.

## BACKGROUND

Shortly after 1:00 a.m. on July 19, 1986, Springfield drove Jolline Havener and Amy Jo Young to a residence in the vicinity of Lodge Grass, Montana, where a party was taking place. Springfield parked his vehicle, but instead of going inside to join the party he, Havener, and Young remained in the vehicle and listened to music. Springfield sat in the driver's seat, and Young sat in the front passenger's seat. In order to make room for Havener to sit on a console between the two front seats, Springfield moved a gun that he had been keeping there to the dashboard. At about that time, Adrian Garcia got into the vehicle and sat down in the back seat. Shortly thereafter, Garcia was shot and killed by a bullet fired from the gun that Springfield had placed on the dashboard.

Springfield's version of the shooting differs from the Government's version. In Springfield's version, Springfield became involved in an argument with Havener. Havener picked up the gun and began waving it around, a struggle ensued between Springfield and Havener for control of the gun, and in the course of the struggle the gun fired in the direction of the back seat and killed Garcia. In the Government's version Springfield picked up the gun off the dashboard, pointed it at Garcia, and fired. A witness also testified that she thought the killing resulted from a disagreement between Springfield and Garcia.

A grand jury indicted Springfield for murder, in violation of 18 U.S.C. § 1111, being a felon in possession of a firearm, in violation of 18 U.S.C.App. § 1202(a), and using a firearm in a crime of violence, in violation of 18 U.S.C. § 924(c).

A jury found Springfield guilty of involuntary manslaughter rather than murder, but also found him guilty of the last two charges—being a felon in possession of a firearm, and using a firearm in a crime of violence. Springfield moved for a judgment of acquittal on the charge of using a firearm in a crime of violence on the ground that involuntary manslaughter is not a "crime of violence" within the meaning of 18 U.S.C. § 924(c). The court denied the motion. Springfield timely appealed.

His appeal raises six issues:

1. Whether involuntary manslaughter is a "crime of violence" within the meaning of 18 U.S.C. § 924(c);

2. Whether the court's handling of the jury selection process was an abuse of discretion;

3. Whether the court's handling of a sleeping juror was an abuse of discretion;

4. Whether the court erred in rejecting Springfield's requested instruction on the defense of accident;

5. Whether the statute proscribing possession by a felon of a firearm was in force on the date of the shooting; and

6. Whether Springfield's conviction of using a firearm in a "crime of violence" represents an impermissible sentence enhancement.

## JURISDICTION

The district court's jurisdiction derived from 18 U.S.C. § 1153, which provides that an Indian who murders or commits manslaughter against another Indian within "Indian Country" is subject to applicable federal laws and penalties. The Crow Indian Reservation, where the shooting incident occurred, is "Indian Country" for purposes of section 1153. 18 U.S.C. § 1151. Our appellate jurisdiction is based on 28 U.S.C. § 1291.

## DISCUSSION

1. *Is Involuntary Manslaughter a "Crime of Violence"?*

■ Involuntary manslaughter is defined under federal law as "the unlawful killing of a human being without malice ... [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution or circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112. The statute proscribing the use of a firearm in a "crime of violence" provides, in pertinent part:

(1) Whoever, during and in relation to any crime of violence[,] ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years.

(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) that by its nature[ ] involves a substantial risk that physical force may be used in the course of committing the offense.

18 U.S.C. § 924(c).

The Government argued at trial that Springfield's act of involuntary manslaughter was a "crime of violence" under the "totality of the circumstances." The court agreed:

Defendant's conduct, in negligently and recklessly pointing a gun in a vehicle and pulling the trigger, was a threat to the lives of those in the vehicle.... [C]ommitting the crime of involuntary manslaughter by the use of a weapon [was] a "crime of violence" which involve[d] a substantial risk that physical force [would] be used against someone.

Springfield argues that the express language of section 924(c) indicates that the proper standard for determining whether involuntary manslaughter is a "crime of violence" is not a circumstantial test, but a categorical "nature of the offense" test. He contends that involuntary manslaughter is not a "crime of violence" under that test. In determining whether involuntary manslaughter is a "crime of violence," we look to the definition in the statute. Section 924(c) requires that, to be classified as a "crime of violence," the defendant's crime must either 1) have as an element the use, attempted use, or threatened use of physical force, or 2) be a crime that entails a substantial risk of physical force "by its nature." 18 U.S.C. § 924(c)(3). The "use, attempted use, or threatened use of physical force" is not an element in the crime of involuntary manslaughter. The first part of the definition, section 924(c)(3)(A), does not apply. The question then is whether involuntary manslaughter is a crime that "by its nature, involves a substantial risk that physical force may be used in the

course of committing the offense." 18 U.S.C. § 924(c)(3)(B).

No court has previously considered whether involuntary manslaughter is such an offense. The wording of section 924(c)(3)(B) covers crimes such as robbery that do not have as an element the use of physical force but "by their nature" create a situation in which it is likely that the criminal may resort to physical force to accomplish the criminal end. S.Rep. No. 225, 98th Cong., 2d Sess. 307, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3486–87. Springfield contends that the section does not cover crimes in which violence actually occurred, but crimes in which there is inherently a *foreseeable* risk that violence could occur. Thus, he argues, the language of 924(c)(3)(B) limits the section to crimes that are anticipated and intended; crimes not requiring criminal intent, but some lesser mental state such as recklessness, are not considered in advance and are therefore excluded. Springfield's argument is plausible, but the language of the section is not exact enough to preclude other interpretations.

The district court did not conclude that involuntary manslaughter "by its nature" involved a substantial risk of physical force as it should have in order to convict under § 924. We find, however, that there was no error in the district court's conclusion. Involuntary manslaughter does, in the sense intended in the statute, carry with it the "risk" of physical force. We conclude that involuntary manslaughter, which "by its nature" involves the death of another person, is highly likely to be the result of violence. It thus comes within the intent, if not the precise wording, of section 924(c)(3).[1]

### 2. *Jury Selection Procedures*

■ At the end of the jury selection process at trial, Springfield had used all of his peremptories, and the Government had either used or waived all of its peremptories, but only eleven jurors had been selected. Since there were no more prospective jurors in the pool, the court obtained an additional prospective juror. Springfield requested permission to exercise an additional peremptory challenge. The court denied his request, but permitted Springfield to rescind one of his earlier peremptory challenges and use that challenge to reject the new prospective juror instead of a previously rejected juror.

Springfield argues that the court's refusal to grant him an additional peremptory challenge was reversible error. He contends that he was "faced with the choice of accepting the new juror, who was undesirable, or replacing her with a person he had already determined was unacceptable." This situation may be unfortunate, but it is no different from the one Springfield would have been in if a sufficient number of jurors had been called in the first place.

■ Fed.R.Crim.P. 24(b) provides that in cases where the offense charged is punishable by imprisonment for more than one year, the defendant is entitled to ten peremptory challenges. There is no right to additional peremptory challenges. The award of additional peremptories is not mandatory, but permissive, and rests in the trial court's sound discretion. *Cf. United States v. Vaccaro*, 816 F.2d 443, 456 (9th Cir.1987) (stating rule in multi-defendant cases). If the additional juror had been included in the original pool, Springfield would have been presented with the same problem he actually encountered here: he had ten peremptories, which the court in its discretion would not increase, and would have to exercise them strategically by accepting an "undesirable" juror as the cost of striking an "unacceptable" one. We do not ignore possible negative consequences of first striking and later reinstating a

---

1. The legislative history indicates that Congress did not intend to limit "crimes of violence" to crimes of specific intent: "Since no culpability level is prescribed in this section, the applicable state of mind that must be shown is, at a minimum, 'reckless,' i.e., that the defendant was conscious of but disregarded the substantial risk that the circumstances existed." S.Rep. No. 307, 97th Cong., 1st Sess. 890–91 (1982). Our analysis of involuntary manslaughter in terms of the likelihood of the occurrence of violence reconciles the words of the statute and the legislative intent to include non-intent crimes.

juror. The remote possibility of prejudice is not a threat to the defendant's Sixth Amendment right to an impartial jury. The orderly, impersonal manner in which peremptories are exercised ensures that any prejudice will be minimal if it exists at all. Defendant's counsel never raised this constitutional issue.

A better approach in a case like this might be to follow a procedure similar to that outlined in the Federal Rules of Criminal Procedure for impanelling alternate jurors. A number of possible alternate jurors are presented, and both sides are permitted an additional peremptory if one additional juror is to be seated. Fed.R. Crim.P. 24(c). This would allow the defendant some choice and eliminate any possibility of prejudice without posing the threat of endless peremptory challenges and delay. The district court did not abuse its discretion, however, in following the procedure it chose. The defendant was not prejudiced by that procedure. The record shows that he had no objections to the added juror at trial.

### 3. The Sleeping Juror

The court had discretion to resolve the problem of the sleeping juror. It considered carefully the testimony missed during the nap and found that it was insubstantial. We find no abuse of discretion in the method used to remedy the situation.

■ Every incident of juror misconduct does not require a new trial. *United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). Our review is limited to considering whether there was a deprivation of Springfield's Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury. *Id.* Springfield has failed to demonstrate that the court's action deprived him of his right to an impartial jury and, more generally, to a fair trial.

### 4. Failure to Give the Requested Jury Instruction

■ Springfield requested and the court refused to give the following instruction:

It is claimed that defendant did not commit any crime because it was an accident. An accident is [an act] that occurs unintentionally and without any mental purpose of decision bringing it about. An accident is a mere physical happening or even out of the usual order of things and cannot reasonably be foreseen as a natural and probable result of some kind of unlawful activity. If all the evidence, including that on the subject of accident, raises a reasonable doubt in your mind as to defendant's intent, the presence of malice aforethought, or heat of passion, then you must return a verdict of not guilty to the charges of second-degree murder or manslaughter.

The jury was instructed 1) that an act is not "knowingly" done if done "because of mistake or accident or [for] other innocent reasons" 2) that the shooting could only be involuntary manslaughter if it was "not the result of misadventure, but [instead] the natural and probable result of a reckless or grossly negligent act" and 3) that an act is "knowing" if it is "done voluntarily and intentionally, and not because of mistake or accident or [an]other innocent reason." We find no error in the refusal to give the proposed instruction. It conveyed essentially the same information as the instruction that was given. Challenges directed only to the trial judge's language or formulation of the charge are reversible only for an abuse of discretion. *United States v. Marabelles,* 724 F.2d 1374, 1382–83 (9th Cir.1984)[2]

2. Springfield cites *Thomas v. United States,* 419 F.2d 1203 (D.C.Cir.1969), for the proposition that because the defense of accident was at issue, the court's failure to explicitly instruct as to the defense was reversible error. His reliance on *Thomas* is misplaced. *Thomas* holds that if (1) the defense of accident is a primary contested issue in a murder case, and (2) the trial court so completely fails to instruct on the issue that the jury "receive[s] no guidance on the issue from the trial court," *id.* at 1206, the court's failure to give the accident instruction is reversible error. In this case, the jury received considerable guidance concerning the accident defense.

5. *Applicability of 18 U.S.C.App. § 1202(a)*

Springfield argues that section 1202(a) does not apply to him because it was repealed on May 19, 1986, two months before the shooting incident. We recognize that Congress repealed section 1202(a) on May 19, 1986, but the repeal did not become effective until November 15, 1986: "The amendments made by this Act shall become effective one hundred and eighty days after the date of the enactment of this Act." Pub.L. No. 99–308, 100 Stat. 460 (1986). *See* 1 U.S.C. § 109. ("The repeal of any statute shall not have the effect [of] releas[ing] ... any penalty, forfeiture, or liability incurred under such statute [so long as the statute remains in force] unless the repealing Act shall ... expressly [so] provide."). *See also United States v. Brown*, 429 F.2d 566, 568 (5th Cir.1970).

6. *Was Springfield's Conviction Under 18 U.S.C. § 924(c) an Impermissible Sentence Enhancement?*

Springfield argues that his conviction under section 924(c) was an impermissible sentence enhancement. He relies upon *United States v. Eagle*, 539 F.2d 1166 (8th Cir.1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977). In *Eagle*, the underlying offense—assault with a dangerous weapon—was subject to federal sanctions only because it involved the use of a firearm. By contrast, Springfield's offense would be subject to federal sanctions even if it had not involved a firearm. *See* 18 U.S.C. § 1112. In addition to being penalized under section 924(c) for carrying a firearm in connection with a "crime of violence," Springfield may properly be penalized under 18 U.S.C.App. § 1202(a) for being a felon in possession of a firearm. Section 924(c) applies to "crime[s] of violence ... which provide [ ] for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." 18 U.S.C. § 924(c). The legislative history of section 924(c) underscores this: Congress stated that it intended for the amended section 924(c) to apply to "all persons who commit Federal crimes of violence, including those crimes set forth in statutes which already provide for enhanced sentences for their commission with a dangerous weapon." 1984 U.S.Code Cong. & Admin.News 3182, at 3491.

The imposition of a cumulative punishment under 18 U.S.C. § 924(c) and 18 U.S.C.App. § 1202(a) is not barred by the double jeopardy clause of the Fifth Amendment. As the Supreme Court has stated, where "a legislature specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the 'same' conduct[,] ... [the trial court] may impose cumulative punishment ... in a single trial." *Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983).

AFFIRMED.