# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2715

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Charles Carl Graham, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 15, 2003

Filed: March 12, 2003

_____

Before WOLLMAN and MURPHY, Circuit Judges, and AUTREY,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Charles Carl Graham was convicted in Missouri state court of second degree murder and attempt to manufacture methamphetamine. After Graham successfully appealed the attempt conviction, the Assistant United States Attorney (AUSA) who had served as a special prosecutor in Graham's state case sought a four-count federal indictment against Graham for drug-related activity. Graham was convicted of all four federal counts and sentenced to life in prison. Graham contends on appeal that

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri, sitting by designation.

the district court[2] erred by denying his motion to dismiss the indictment for vindictive prosecution and by sentencing him in accordance with the guidelines for murder rather than the guidelines for drug offenses. He also challenges the sufficiency of the evidence supporting his convictions. We affirm.

## I. Background

Trial testimony indicated that Graham had been involved in the manufacture and distribution of methamphetamine since 1995. In September 1996, Graham entered into a lease agreement for property located in rural Missouri near Blairstown in Henry County. He also purchased a mobile home that was located on the property. On September 16, 1996, an explosion and fire destroyed a wooden outbuilding located approximately twenty yards behind the mobile home. Michael Duncan and David Alexander were burned in the fire. Alexander died as a result of the injuries he sustained.

Deputy Sheriff Jerry Mosley arrived on the scene shortly after the explosion. He observed a hot plate, microwave oven, Pyrex bowls, beakers, and plastic bottles in the debris of the burned out building. Deputy Mosley spoke with Graham, who indicated that he was not present when the fire started but that he believed a gasoline engine on a weed eater or lawn mower had caused the fire. Deputy Mosley's subsequent investigation, however, led him to conclude that the fire had been caused by a working methamphetamine lab. A search of the property revealed various items that tended to support such a conclusion, including a bottle of mannitol, Vision Ware and Pyrex brand cookware, round bottom and flat bottom flasks, six cans of Coleman fuel, a gallon of acetone, several cans of acetone, twenty-four bottles of

---

[2]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, denied Graham's motion. The case was then transferred to the Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

pseudoephedrine, funnels, plastic tubing, a pressure cooker containing a white powder in a liquid solution, and three one-pound bottles of iodine pills, a pellet form of black iodine. Officers also found a photocopy of the book Uncle Fester's Secret for Methamphetamine Manufacturing and a large amount of cash in the mobile home.

Graham was arrested at the scene. After his release, Graham met with Steve McKee, one of Duncan's associates. Graham suggested that McKee move his methamphetamine lab to a building in North Kansas City. The lab was moved, and in December 1996 Graham and McKee produced approximately one pound, five ounces of methamphetamine. At trial, the lessee of the North Kansas City building identified Graham as the tenant of the property from spring 1996 to spring 1997.

In November 1997, AUSA Mark Miller, as special prosecutor for Henry County, Missouri, filed separate criminal complaints in state court charging Graham and Duncan with second degree murder (felony murder) and attempted manufacture of methamphetamine. On December 10, 1997, Miller filed a felony information charging Graham with the same offenses. While in custody, Graham spoke with Sergeant James Wingo. Graham told Sergeant Wingo that he had been at the rural Blairstown property when the September 16, 1996, fire started. Graham explained that while he was sleeping in the mobile home, Duncan and another individual arrived and started cooking methamphetamine. According to Graham, he was awakened by the commotion following the explosion and saw both Duncan and Alexander "running around in the yard on fire." Graham also indicated that he had learned how to manufacture methamphetamine from Duncan and that he had been involved in several large cooks with Duncan prior to the September 16 fire.

Miller prosecuted the state case against Graham. A jury convicted Graham of both second degree murder and attempt to manufacture methamphetamine. Graham was sentenced to thirty years in prison on the murder count and fifteen years on the attempt count. He appealed, arguing, inter alia, that the trial court had erred in

instructing the jury on the attempt charge. The Missouri Court of Appeals affirmed the murder conviction but reversed the attempt conviction and remanded for a new trial on the attempt charge. See State v. Graham, 2 S.W.3d 859 (Mo. Ct. App. 1999). The case was set for retrial on June 12, 2000, but was continued. In February 2001, Henry County prosecutor John Kopp dismissed the remanded attempt charge.

On June 9, 2000, Miller filed a federal criminal complaint, alleging that Graham had conspired to manufacture methamphetamine between August 1, 1996, and September 16, 1996, in Henry County. On July 12, 2000, Miller filed a four-count indictment against Graham, alleging that he had (1) conspired to manufacture methamphetamine in the amount of one kilogram or more between January 1, 1995, and January 1, 1997, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846; (2) aided and abetted an attempt to manufacture methamphetamine in the amount of 100 grams or more in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846; (3) created a substantial risk of harm to human life while aiding and abetting an attempt to manufacture a controlled substance in violation of 18 U.S.C. § 2 and 21 U.S.C. § 858; and (4) made a building available for the purpose of manufacturing methamphetamine in violation of 21 U.S.C. § 856(a)(2), (b). The latter three charges related to the events of September 16, 1996.

Graham moved to dismiss the indictment on the ground of vindictive prosecution. He pointed out that the state criminal charges and the federal indictment involved essentially the same criminal conduct, that the federal charges were not filed until after he had successfully appealed his state attempt conviction, and that Miller prosecuted both the state and federal cases. Thus, Graham concluded, the federal prosecution was motivated by actual and presumed vindictiveness. The magistrate judge[3] disagreed, concluding that even if Graham had made a prima facie showing of

---

[3]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

vindictive prosecution, the government had successfully rebutted any possible inference of vindictiveness. The district court adopted the magistrate judge's report and recommendation and denied Graham's motion.

On December 14, 2001, Graham was convicted on all four counts in the indictment. A presentence investigation report was ordered, and Graham objected to, inter alia, the calculation of his base offense level. The district court overruled Graham's objection and sentenced Graham to life imprisonment, to be served concurrently with the thirty-year sentence imposed by the Henry County Circuit Court.

## II. Analysis

### A. Vindictive Prosecution

In North Carolina v. Pearce, the Supreme Court explained that "[d]ue process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." 395 U.S. 711, 725 (1969), overruled in part by Alabama v. Smith, 490 U.S. 794 (1989). To assure the absence of retaliatory motivations, the Court concluded that:

> [W]henever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record . . . .

<u>Id.</u> at 726.[4]  In a later opinion, the Supreme Court summarized the rule of <u>Pearce</u> as follows:  "[T]he Court applied a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence."  <u>United States v. Goodwin</u>, 457 U.S. 368, 374 (1982).

In <u>Blackledge v. Perry</u>, the Supreme Court extended the "prophylactic rule of <u>Pearce</u>" to certain circumstances in which "the central figure is not the judge[,] . . . but the prosecutor."  417 U.S. 21, 26, 27 (1974).  Perry had been convicted of assault in a state district court with exclusive jurisdiction over misdemeanors and was sentenced to six months in prison.  <u>Id.</u> at 22.  Under North Carolina law, Perry was entitled to a trial <u>de</u> <u>novo</u> in the Superior Court.  <u>Id.</u>  After Perry filed his notice of appeal, the prosecutor obtained an indictment charging Perry with a felony, assault with a deadly weapon, based on the same conduct for which Perry had been tried in the district court.  <u>Id.</u> at 23.  Perry pled guilty and was sentenced to a term of five to seven years in prison.  <u>Id.</u>  Noting that in such circumstances "[a] prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing," the Court concluded that "it was not constitutionally permissible for the State to respond to Perry's invocation of his statutory right to appeal by bringing a more serious charge against him prior to the trial <u>de</u> <u>novo</u>."  <u>Id.</u> at 27, 28-29.  Thus, "[a]s in <u>Pearce</u>, the Court held that the likelihood of vindictiveness justified a presumption that would free defendants of apprehension of . . . retaliatory motivation on the part of the prosecutor."  <u>Goodwin</u>, 457 U.S. at 376.

We have stated that "[a] defendant may demonstrate prosecutorial vindictiveness in two ways."  <u>United States v. Beede</u>, 974 F.2d 948, 951 (8th Cir.

_____

[4]In <u>Alabama v. Smith</u>, the Supreme Court overruled <u>Simpson v. Rice</u>, the companion case to <u>North Carolina v. Pearce</u>.  The <u>Smith</u> court concluded that no presumption of vindictiveness arises when the first conviction was based on a guilty plea, and the increased second sentence followed a trial.  <u>Smith</u>, 490 U.S. at 795.

1992). "First, a defendant may prove through objective evidence that the prosecutor's decision was intended to punish him or her for the exercise of a legal right." Id. (citing Goodwin, 457 U.S. at 384 n.19). "Second, a defendant may in certain circumstances rely on a presumption of vindictiveness." Id. Graham does not rely on any objective evidence of vindictiveness; instead, he argues that a presumption of vindictiveness applies in the circumstances of his case.

Graham contends that in bringing federal charges against him, Miller was punishing him for appealing his state attempt conviction. Graham's claim appears to fit within the general framework of Perry: after he invoked his right to appeal the state convictions, Miller prosecuted him in federal court on charges that exposed Graham to greater punishment than that imposed by the state court. Graham's case is distinguishable in one important aspect: in Perry, the defendant was prosecuted twice by the same sovereign, i.e., the state. The government reminds us that "[g]iven a variety of fact patterns, federal courts repeatedly have rejected the idea that federal prosecution, after state proceedings, constitutes vindictive prosecution." United States v. Raymer, 941 F.2d 1031, 1041 (10th Cir. 1991) (citations omitted); see also Beede, 974 F.2d at 951-52 (finding that no presumption of vindictiveness arose when the federal government prosecuted the defendant after he refused to plead guilty to pending state charges). We agree with the magistrate judge, however, that this case "is unique in that the same person, Mark Miller, acted both as a special prosecutor for Henry County and then brought the indictment against defendant Graham in federal court." We also agree that Graham's circumstances present us with a close question as to whether he has made "a prima facie showing of vindictive prosecution." Nevertheless, we leave this issue for another day, because we agree with the magistrate judge that the government has successfully rebutted any presumption of vindictiveness that may have arisen on the facts of this case.

As an initial matter, we reject Graham's contention that the government can rebut a presumption of vindictiveness only by showing that it was impossible to bring

the federal charges at the time the state charges were initiated. To support his assertion, Graham relies on the following footnote from Goodwin, which, in turn, relied on a footnote from the Perry decision: "The presumption again could be overcome by objective evidence justifying the prosecutor's action. The [Perry] Court noted: 'This would clearly be a different case if the State had shown that it was impossible to proceed on the more serious charge at the outset . . . .'" Goodwin, 457 U.S. at 376 n.8 (quoting Perry, 417 U.S. at 29 n.7). We agree with the government that the language from Perry is merely an acknowledgment that the presumption of vindictiveness can be rebutted by objective evidence justifying the prosecutor's action, rather than a bright-line rule limiting the means by which the presumption can be rebutted. See Pearce, 395 U.S. at 726; see also United States v. Burt, 619 F.2d 831, 836 (9th Cir. 1980) (stating that the presumption of vindictiveness can be rebutted where the prosecutor can show that his actions were "'justified by independent reasons or intervening circumstances which dispel the appearance of vindictiveness'" (citation omitted)). In short, we do not read either the Goodwin or Perry footnotes as narrowly as does Graham. Thus, we turn now to the record.

The government directs us to evidence indicating that the decision to prosecute Graham in federal court was made long before he appealed his state court conviction. This evidence contradicts Graham's claim that the federal charges were brought to punish him for exercising his right to appeal. See United States v. Punelli, 892 F.2d 1364, 1372 (8th Cir. 1990). The record also indicates that the decision to prosecute Graham in both state and federal court was based, in part, on (1) the state prosecutor's admission that his office was not equipped to handle the complications of drug conspiracy cases, and (2) Miller's conclusion that he could not prosecute Graham for felony murder under federal law. This evidence also undermines Graham's assertion that the federal charges were the result of "an impermissible response to noncriminal, protected activity," rather than "a legitimate response to perceived criminal conduct." Goodwin, 457 U.S. at 372-73. Finally, we note the circumstances that led to Miller's appointment as the special prosecutor in the state case. Before the September 16,

1996, explosion, Miller learned that Graham had been implicated in a federal investigation involving Duncan. After the explosion, Miller contacted Henry County prosecutor John Kopp and advised him that federal charges were being pursued against Duncan and Graham. According to Kopp, Miller's prior knowledge regarding Graham influenced his decision to suggest that Miller act as special prosecutor in the state case. Kopp also cited his lack of experience with methamphetamine lab cases and Miller's experience with such cases as reasons for seeking Miller's assistance. Given these circumstances, we, like the magistrate judge, are persuaded that Miller's dual role was "justified by sufficiently independent reasons to dispel any possible appearance of vindictiveness."

For the reasons discussed above, we conclude that even if the circumstances of this case had warranted a presumption of vindictiveness, the government has successfully rebutted this presumption. Thus, the district court did not err in denying Graham's motion to dismiss the indictment.

## B. Sentencing Claim

Graham contends that the district court erred by calculating his base offense level under U.S.S.G. § 2A1.1. "'We review the application of the guidelines . . . de novo and factual findings for clear error.'" United States v. Barrios-Perez, 317 F.3d 777, 780 (8th Cir. 2003) (quoting United States v. Gomez, 271 F.3d 779, 781 (8th Cir. 2001)).

In determining the appropriate base offense level, the district court looked to U.S.S.G. § 2D1.1, which applies to certain drug offenses. Section 2D1.1(d)(1) directs the application of § 2A1.1 (First Degree Murder) if "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." Section 1111 defines murder as "the unlawful killing of a human being with malice

aforethought." 18 U.S.C. § 1111(a). First degree murder includes "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing," as well as killings committed during the perpetration of certain enumerated felonies. Id. "Any other murder is murder in the second degree." Id. Thus, malice is an element of murder in the second degree.

During Graham's sentencing hearing, the government argued that David Alexander's death in the September 16, 1996, fire fell within § 1111's definition of murder in the second degree. The district court agreed that § 2A1.1 should be applied in calculating Graham's base offense level.[5] Graham contends that the circumstances surrounding Alexander's death do not support a finding of malice. We disagree.

In United States v. Black Elk, 579 F.2d 49, 51 (8th Cir. 1978), we explained that "[m]alice does not require proof of a subjective intent to kill." Instead, "[m]alice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" 579 F.2d at 51 (quoting United States v. Cox, 509 F.2d 390, 392 (D.C. Cir. 1974)); see United States v. Bordeaux, 980 F.2d 534, 536 (8th Cir. 1992). Trial testimony indicated that Graham had been manufacturing methamphetamine, and soliciting others to join him in doing so, since 1995. Trial testimony also indicated that the process of manufacturing methamphetamine involves flammable materials and chemical reactions. We have recognized that "[t]he potential hazards of methamphetamine manufacture are well documented." United States v. Walsh, 299

---

[5]In doing so, the district court concluded that because Alexander's death occurred during the commission of a felony, § 2A1.1 applied. We agree that this guideline applies, but for a different reason. See United States v. Oligmueller, 198 F.3d 669, 671 (8th Cir. 1999) ("We may affirm the district court on any basis supported by the record." (citation omitted)).

F.3d 729, 734 (8th Cir.) (citations omitted), <u>cert.</u> <u>denied</u>, 123 S. Ct. 617 (2002). As Sergeant Wingo testified, one such hazard is explosions. Thus, it is entirely reasonable to infer that, given his familiarity with the process of manufacturing methamphetamine, Graham "was aware of a serious risk of death or serious bodily harm" associated with the operation of a methamphetamine lab. <u>Black Elk</u>, 579 F.2d at 51. The record therefore supports a finding that Graham's conduct was "reckless and wanton, and a gross deviation from a reasonable standard of care." <u>Id.</u>

Graham also contends that the government's position at the sentencing hearing was inconsistent with its position on his motion to dismiss the federal indictment. During the hearing on Graham's motion, the government argued that the decision to prosecute Graham in both state and federal court was based, in part, on AUSA Miller's inability to charge Graham with felony murder under federal law. During the sentencing hearing, the government argued that the circumstances surrounding Alexander's death supported a finding of malice. We see no inconsistency in these positions.

For the reasons discussed above, we conclude that the district court did not err by relying on U.S.S.G. § 2A1.1 in calculating Graham's base offense level.

## C. Sufficiency of the Evidence

Although Graham challenges the sufficiency of the evidence supporting his convictions, he does not direct us to any specific elements wherein the government's evidence was lacking. Our review of the record satisfies us that the evidence was sufficient. <u>Barrios-Perez</u>, 317 F.3d at 778-79 (standard of review).

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.